IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ROBERT J. JOHNSON                                                    PLAINTIFF

V.                              NO.  4:07cv00779 JWC

MICHAEL J. ASTRUE,                                                  DEFENDANT
Commissioner, Social
Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff, Robert Jay Johnson, seeks judicial review of the denial of his claim for a period of disability and disability insurance benefits and supplemental security income (SSI) benefits.  Plaintiff has filed a motion for summary judgment and supporting brief (doc. 7, 8), and the Commissioner has responded (doc. 9).

For the reasons that follow, the Court[1] **reverses** the Commissioner's decision and **remands** the case for further administrative proceedings.

I.

Judicial review of the Commissioner's denial of benefits examines whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole.  42 U.S.C. §§ 405(g), 1383(c)(3); *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

---

[1]The parties have consented to the jurisdiction of the United States Magistrate Judge (doc. 2).

II.

In his application documents and at the hearing before the ALJ, Plaintiff alleged inability to work since September 15, 2003, due to degenerative joint disease, stomach bleeding, high blood pressure, a heart condition, arthritis in his back and neck, high cholesterol, carpal tunnel syndrome, a kidney problem, a skin condition, and pain in his lower back, legs, neck, shoulders, hands, arms, knees, feet , fingers, and chest.   (Tr. 89, 105, 112, 532-33, 535, 538-40.)   Plaintiff was born on November 4, 1951, has a twelfth-grade education, and finished three years of college, where he studied criminal justice.  (Tr. 90, 118, 531.)  He was an active-duty military police officer from 1978 to 1996, then worked as a prison corrections officer for seventeen years.  (Tr. 113, 531, 543-44.) He worked as a law enforcement officer with the Veterans Administration (VA), until he failed to pass the annual physical examination in September 2003.  (Tr. 112, 164-67, 531-32, 544.)

Under the applicable law, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The regulations provide a five-step sequential process to determine whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Basically, those procedures require the ALJ to take into account whether a claimant is working, whether the claimant's physical or mental impairments are severe, whether the impairments meet or equal an impairment

2

listed in the regulations, whether the impairments prevent a resumption of work done in the past, and whether they preclude any other type of work.  *Id.*

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  The ALJ next determined, at step two, that Plaintiff suffered from severe impairments of degenerative disc disease at C5-C6, degenerative changes of the lumbar spine, degenerative joint disease (arthritis) in the knees, right shoulder, and left hip, chest pain due to anxiety, and hypertension, but that none of his impairments, individually or in combination, equaled a step-three listed impairment as contained in the regulations.  At step four, the ALJ found that Plaintiff was unable to perform his past relevant work but retained the residual functional capacity (RFC) to perform a full range of sedentary, skilled jobs.  At step five, after taking testimony from a vocational expert and considering Plaintiff's age ("closely approaching advanced age"), education, transferable skills and RFC, the ALJ found that there were a significant number of jobs in the national economy which Plaintiff could perform, *i.e.*, parole counselor and dispatcher.  The ALJ thus concluded that Plaintiff was not disabled.  (Tr. 15-22.)  Plaintiff pursued administrative review with no success, making the ALJ's decision the final decision of the Commissioner.  (Tr. 4-6.)

Plaintiff argues that the ALJ erred (1) in failing to sufficiently consider his chronic joint and back pain in assessing his RFC; (2) in discounting his severe impairments of pseudofolliculitis barbae (skin condition) and carpal tunnel syndrome; (3) in failing to consider the effects of his medications; (4) in failing to address his chest pain; (5) in rejecting without justification his subjective complaints of pain; and (6) in submitting a hypothetical question to the vocational expert that did not cover all his impairments and

3

limitations.  The Court will address Plaintiff's arguments in the order they are generally addressed in the sequential evaluation process.


III.

An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1521(a), 416.921(a).  Examples of these activities include: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling.  *Id.* §§ 404.1521(b), 416.921(b).  An impairment is not severe when it amounts only to a slight abnormality which would have no more than a minimal effect on an individual's ability to work.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  The claimant bears the step-two burden of establishing that an impairment is severe, but it is "not an onerous requirement" to meet.  *Id.* at 707-08.

Substantial evidence supports the ALJ's decision that Plaintiff's skin condition (pseudofolliculitis barbae)[2] did not affect his ability to perform work-related functions.  The ALJ acknowledged that Plaintiff was being treated at the VA for the chronic condition and it was one of the reasons he was receiving VA disability benefits.  (Tr. 17, 18; *see* Tr. 78-79, 125-28.[3])  However, he appropriately discounted its effect because Plaintiff had worked for many years with the condition.  (Tr. 18; *see e.g.* Tr. 282 [plaintiff has "had this problem for over 11 years since his service with the military"].)  *See Goff v. Barnhart*, 421 F.3d 785,

---

[2]This is irritation of the skin due to beard hairs that penetrate the skin before leaving the hair follicle or leave the follicle and curve back into the skin, causing a foreign-body reaction.  *The Merck Manual* 1008 (18th ed. 2006).

[3]Many of the VA medical records are duplicates.

792-93 (8th Cir. 2005) (claimant's ability to work in the past with alleged impairments demonstrates they are not presently disabling).  Furthermore, Plaintiff has not explained how the skin condition would impair his ability to perform any work-related tasks.

The same is not true for Plaintiff's carpal tunnel syndrome.  The ALJ acknowledged that Plaintiff had carpal tunnel but said there was no diagnosis and no nerve conduction studies were ever performed.  (Tr. 18.)  This is incorrect.  In November 2001, Plaintiff was referred to a VA rheumatologist, Dr. Safwan Sakr for complaints of severe pain in both shoulders and both wrists, the left more than the right.  (Tr. 212, 302-04.)  X-rays for wrists, hands and shoulders were noted to be "unremarkable," but Dr. Sakr found "frank synovitis" (joint inflammation) in the left wrist, with restricted flexion and extension.  (Tr. 212; *see* Tr. 175-76.)  The next month, he was still complaining of arthralgia with tingling in his fingers. Dr. Sakr assessed "questionable" carpal tunnel syndrome and ordered EMG/NCS studies. (Tr. 297-98.)  On February 7, 2002, EMG/NCS tests were performed with the following results reported by the neurologist, W. Steven Metzer, M.D.: (1) mild to moderate focal neuropathy of the left median nerve at the wrist, consistent with carpal tunnel entrapment; (2) very mild focal neuropathy of the right median nerve at the wrist, consistent with carpal tunnel entrapment, (3) mild focal neuropathy of the left ulnar nerve at the elbow, consistent with cubital tunnel entrapment; (4) no evidence of right ulnar neuropathy; and (5) no evidence of left or right radiculopathy.  (Tr. 204-06, 265-67, 291-93.)  On April 3, 2002, Dr. Sakr assessed "rotator cuff injury bilaterally" and "carpal tunnel that was proved by NCS." (Tr. 291.)  Wrist splints were ordered.  (Tr. 203, 289.)  In June 2002, Plaintiff complained of numbness and tingling of the left hand.  (Tr. 201-02, 283-84.)  In August 2003, he complained of pain and numbness in both shoulders, arms and hands, left more than the

right.  Lorene Lomax, M.D., found normal grip strength, but diagnosed C5-6 radiculopathy. (Tr. 239-43, 427-28.)   As stated, Plaintiff failed to pass his annual physical exam on September 17, 2003.   Among other things, he said he could not safely perform the following: straight pulling, pulling hand over hand, pushing, reaching above shoulder, using fingers.  (Tr. 121.)  The examining doctor noted bilateral shoulder pain, arthritic pain, hand pain and transient weakness, as well as tingling in his hands and forearms.  (Tr. 164-67.) In January 2005, he told his primary care provider, Arthur L. Neal, M.D., that he had experienced tingling and numbness in both hands for the past month, he had shoulder pain when lifting his arm, and he was dropping objects involuntarily.  (Tr. 405-06.)

In the supporting documentation for his benefits applications, Plaintiff alleged pain in his hands, fingers, shoulders and arms, said he needed help with personal grooming because he couldn't bend or reach, said he did no household chores, said he did no shopping because he had problems reaching, and said he "can't hold things in [his] hand without dropping them."  (Tr. 87, 89, 96, 103, 105.)   At the administrative hearing in January 2006, he testified that he experienced constant pain in his hands and shoulders. (Tr. 532-33.)  He said that, in his last job at the VA, he worked some days as a dispatcher but reached the point where he was not able to even do that, because his hands would start cramping, hurting and twitching, causing him to drop things.  (Tr. 541.)  He said that now he sometimes has to set down his cup of coffee or hold it with two hands because his hands shake so badly.  (Tr. 541.)

At the hearing, the ALJ said the VA records he had reviewed did not indicate Plaintiff had carpal tunnel syndrome but said he was waiting on more records to be submitted.  (Tr. 527-30, 550-51.)  He said, "If you do have carpal tunnel, that's going to certainly restrict the

ability to do some of these jobs [identified by the vocational expert] but I don't know how serious it is right now.  You're not wearing splints or anything like that.  And generally a sedentary, sit down type job, you can't do most of those jobs if you have carpal tunnel." (Tr. 551.)

This record clearly demonstrates repeated complaints by Plaintiff of limitations with his hands and arms, a carpal tunnel syndrome diagnosis, and supporting nerve conduction studies.

The Commissioner argues that findings of the nerve conduction studies "hardly revealed a disabling condition" (doc. 9, at 6).  However, at step two, Plaintiff is only required to show an impairment that more than minimally affects his ability to perform basic work activities.  The references cited above demonstrate Plaintiff has met this burden regarding carpal tunnel syndrome and its related limitations.  Remand is required for proper consideration of this impairment at step two, in combination with his other impairments at step three, and at the other steps of the sequential evaluation as explained below.

III.

RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his physical or mental limitations.  20 C.F.R. §§ 404.1545(a)(1), (b) & (c), 416.945(a)(1), (b) & (c).  The ALJ bears the final responsibility for assessing a claimant's RFC at step four of the sequential evaluation, based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  *Page v. Astrue*, 484 F.3d

1040, 1043 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 416.927(e)(2), 416.945(a)(3).

Here, the ALJ determined that Plaintiff had the RFC to perform the full range of sedentary work, *i.e.*, primarily sitting with normal breaks at two-hour intervals, but may require occasional lifting of no more than ten pounds at a time and occasional walking and standing, for no more than two hours out of an eight-hour day.  (Tr. 20-21.)  20 C.F.R. §§ 404.1567(a), 416.967(a); Soc. Sec. Rul. 96-9p, 1996 WL 374185, at *6 (S.S.A. 1996).

Upon remand, the ALJ must reassess this RFC in light of Plaintiff's carpal tunnel syndrome and any manipulative or reaching limitations it imposes.

Plaintiff also argues that, in assessing RFC, the ALJ gave insufficient consideration to the extent of his chronic pain in the joints of his shoulders, hips and knees, failed to "fully appreciate" the extent of his back impairment, failed to consider the amount of medication that he takes in an effort to control his pain, and failed to address his chest pain and the medications he was taking to treat it.

In formulating an RFC, the ALJ must necessarily evaluate a claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007).   A claimant's subjective complaints may be discounted if they are inconsistent with the evidence as a whole.  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007).  The ALJ is in the best position to gauge credibility and is granted deference in that regard as long as he explicitly discredits a claimant's subjective testimony and gives good reasons for doing so.  *Id.* at 695-96.  *See* 20 C.F.R. §§

404.1529(c), 416.929(c);[4] *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984); Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *3, *5 (S.S.A. 1996).

Plaintiff testified that he suffers from constant pain in his hands, shoulders, back, knees, and hips, regardless of whether he is lying down, sitting, or standing, and takes about 180 pain pills a month. He said he does not really do anything all day, except watch tv and maybe walk outside. (Tr. 532-34.) He said he sometimes needs help bending over to tie his shoes, putting on a t-shirt or even getting out of bed or a chair. (Tr. 537-38.) He said any amount of walking hurt his knees, legs and hips, and caused him to get short-winded. He said he uses a cane because his knee locks up and his back "catches." (Tr. 539-40.) He said he could sit for about thirty minutes at a time and has to change positions frequently to find a comfortable position for his back. (Tr. 542.)

The ALJ stated that he had evaluated Plaintiff's subjective allegations and complaints in accordance with *Polaski* and other relevant authority, finding that Plaintiff's statements were "not borne out by the record" and were not "fully credible to the extent alleged." (Tr. 19.) He gave the following reasons: (1) Plaintiff's restricted daily activities appeared to be by choice, and not due to limitations placed by any of his treating physicians; (2) despite a "plethora of tests," little objective medical evidence supported his level of pain; (3) his pain appeared to be controlled by medications; and (4) his motivation

---

[4]As stated in this regulation, the ALJ's credibility analysis should consider, in addition to the objective medical evidence and the claimant's prior work record, statements and observations made by the claimant, his or her medical providers and any others regarding (1) the claimant's daily activities, (2) the location, duration, frequency and intensity of pain or other symptoms, (3) precipitating and aggravating factors, (4) type, dosage, effectiveness and side effects of medications, (5) non-medication treatments or other measures taken to alleviate pain and symptoms, and (6) functional limitations.

to return to work was lacking as he received a policeman's pension and a VA disability pension.  (Tr. 19-20.)  The ALJ also observed that, on May 12, 2003, just a few months before his alleged onset date, he reported that he felt he was able to perform his regular duties and was "stable" to return to work.  (Tr. 17; *see* Tr. 247.)

In discounting Plaintiff's allegations, the ALJ recognized that he has some degree of pain but properly considered the absence of objective medical evidence to support his allegations of disabling pain.  (Tr. 20.)  This finding is supported by the record.  The most recent testing has shown "spurring and disc space narrowing at L5-S1" and "degenerative changes in the facet joints at L3-4 and L4-5 on the left side" (Tr. 169); "C5-C6 degenerative disc disease without significant neural foraminal narrowing" and with "mild loss of disc height, as well as marginal anterior and posterior osteophytes" (Tr. 170, 456-57); and "slight narrowing of the medial joint space" on the right knee (Tr. 452-53).  However, a bone scan was normal (Tr. 173-74), and minimal or no abnormalities are noted in numerous radiology reports regarding his shoulders (Tr. 173, 179, 181, 453-55) and hips (Tr. 168, 455-56, 508).

Furthermore, in a physical evaluation on April 6, 2004, Jose Escarda, M.D., observed that Plaintiff was ambulatory with no abnormal gait patterns, his spinal alignment was fair to good, he had normal tone and strength, sensory and reflexes were normal, and there were no signs of active joint inflammation in the major joints of the upper and lower extremities, no nerve root tension signs, negative Spurling/hyperextension testing, and no shoulder/knee instability.  Dr. Escarda said there were "minimal objective findings with historical suggestion of possible autoimmune process."  He said he doubted that therapy would offer any benefit for Plaintiff's multiple joint pains of "as yet undetermined etiology."

(Tr. 189-90, 219, 413-14, 423, 431-32, 423.)  Examining him again in February 2005, Dr. Escarda wrote that Plaintiff had multiple joint pain complaints with "very minimal joint residual findings including absence of acute or chronic joint inflammation."  He found "full passive and active mobility" for all major joints.  (Tr. 402-03, 506-07.)  It was noted by Plaintiff's primary care physician, Dr. Neal, that he had a negative rheumatology work up for inflammatory arthritis.  (Tr. 249-50.)  As found by the ALJ, these medical findings are inconsistent with a claim of debilitating pain.  *See Steed v. Astrue*, 524 F.3d 872, 875-76 (8th Cir. 2008) (upholding RFC for light work where claimant had mild or minimal disc bulging and herniation and mild scoliotic curvature, but no nerve compression, nerve root displacement or spinal stenosis); *Anderson v. Barnhart*, 344 F.3d 809, 811-15 (8th Cir. 2003) (affirming ALJ's conclusion that claimant suffering from severe degenerative disc disease retained the RFC to perform light and sedentary work).

Similarly, Plaintiff underwent a complete diagnostic evaluation based on complaints of chest pain and shortness of breath.  (Tr. 360-80, 439-52, 492-94.)  X-rays, an EKG and other tests were normal (Tr. 361-64, 367, 381, 441), and two physicians determined that his symptoms could be due to panic attacks, anxiety disorder or reflux.  (Tr. 370-71, 371-78.)

The record does reflect that Plaintiff has been prescribed significant amounts of pain medication.  (*See* Tr. 124.)  He testified that he takes 180 pain pills a month, but still experiences constant pain.  (Tr. 534.)  On March 5, 2004, a VA "polypharmacy assessment" cautioned that his daily dosage of prescribed pain pills was 5200 mg (5.2 g), exceeding the recommended daily dose of 4g.  (Tr. 221-23, 415-18.)  On remand, the ALJ should clarify and discuss how much medication Plaintiff actually takes, any side effects

of the medication, whether it alleviates his pain, and how this affects his functional capacity.

In summary, the ALJ should reassess Plaintiff's RFC in light of his severe impairment of carpal tunnel syndrome and the amount of pain medication that he must take to make his pain tolerable.

IV.

At step five, the Commissioner bears the burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity and vocational factors can perform. 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). However, vocational expert testimony based on hypothetical questions that do not encompass all of a claimant's relevant impairments cannot constitute substantial evidence to support the Commissioner's step-five decision. *Wilson v. Astrue*, 493 F.3d 965, 967 (8th Cir. 2007).

Here, the vocational expert testified that a person with Plaintiff's occupational background would have acquired skills that were transferable to certain sedentary jobs, identifying the positions of parole or pre-parole counselor and dispatcher. (Tr. 548-50.) The ALJ found that this testimony established the existence of significant numbers of jobs in the national economy which Plaintiff could be expected to perform. (Tr. 21-22.) Neither the expert nor the ALJ took into account any restrictions on repetitive handling, reaching or other manipulative functions that might be experienced due to carpal tunnel syndrome. The absence of any such limitations is particularly troublesome because Plaintiff specifically testified that he could not perform one of the jobs identified by the expert, a dispatcher position, due primarily to problems with his hands cramping, hurting, twitching,

and dropping things.  (Tr. 541, 550.)  Furthermore, as stated, the ALJ recognized that the presence of carpal tunnel syndrome could restrict the ability to perform many sedentary jobs.  (Tr. 551.)  Therefore, after determining the extent of his limitations, the ALJ should consult further with the vocational expert to determine how the limitations would diminish his ability to perform the full range of sedentary jobs and whether, in light of his RFC and the other relevant factors, there are jobs in the national economy which Plaintiff can perform.

V.

ACCORDINGLY, the Commissioner's decision is **reversed** and this matter is **remanded** to the Commissioner for further proceedings consistent with this opinion.  This is a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).  In light of this ruling, the Clerk of the Court is directed to remove Plaintiff's motion for summary judgment (doc. 7) from the pending motions list.

IT IS SO ORDERED this 30th day of September, 2008.


_____
UNITED STATES MAGISTRATE JUDGE